CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

NOV 13 2018

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| TERRENCE K., | ) | |
| Plaintiff, | ) | Civil Action No. 4:17-cv-00060 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | By:    Joel C. Hoppe |
| SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Terrence K. asks this Court to review the final decision of the Acting

Commissioner of Social Security ("Commissioner"), denying his application for supplemental

security income ("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§

1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 11.

Having considered the administrative record, the parties' briefs, and the applicable law, I cannot

find that substantial evidence supports the Commissioner's final decision. Accordingly, I

recommend the decision be reversed and the case be remanded under the fourth sentence of 42

U.S.C. § 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 1383(c)(3); *see also Hines

v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *accord* 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Terrence K. filed for SSI on January 30, 2014, alleging that he was disabled by total heart blockage and a history of heart attacks, high blood pressure, shortness of breath, sleep apnea, and a right knee cap replacement. *See* Administrative Record ("R.") 70–71, 189, ECF No. 9-1. Disability Determination Services ("DDS"), the state agency, denied his claims at the initial and reconsideration stages. R. 69–78, 79–90. On February 2, 2016, Terrence K. appeared with counsel at an administrative hearing before ALJ Brian Kilbane, and he testified about his medical conditions and alleged functional limitations. *See* R. 52–66. A vocational expert ("VE") also testified at the hearing. R. 62–65.

ALJ Kilbane denied Terrence K.'s application in a written decision issued on March 2, 2016. R. 36–47. He found that Terrence K.'s ischemic heart disease with angina, hypertension, and obesity were "severe" medical impairments, but that all other medical conditions alleged in the record were "non-severe because they did not exist for a continuous period of twelve months, were responsive to medication, did not require significant medical treatment, or did not result in any continuous exertional or non-exertional functional limitations." R. 38.

ALJ Kilbane next assessed whether any of Terrence K.'s severe impairments met or medically equaled a listing under 20 C.F.R. § 404, Subpart P, Appendix 1. In doing so, he primarily focused on Terrence K.'s heart condition. R. 38–39. He found that while Terrence K.

"has discomfort or pain due to myocardial ischemia," he did not meet all of the criteria in Listing 4.04 pertaining to ischemic heart disease. *See* R. 39–40.

Additionally, ALJ Kilbane evaluated Terrence K.'s residual functional capacity ("RFC"). *See* R. 39–46. He determined that Terrence K. could perform "light work"[1] as defined in the regulations, except that he could never crawl or climb ladders, ropes, or scaffolds; he could only occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; and he must avoid concentrated exposure to extreme temperatures. R. 39. Based on this RFC and the VE's testimony, ALJ Kilbane concluded at step four that Terrence K. could not perform his past work as a general laborer, landscape worker, custodian, and material handler. R. 46. At step five, however, the ALJ concluded that Terrence K. could perform certain light occupations, such as fast food worker, cashier, and counter or rental clerk that existed in significant numbers in the national and local economies. R. 46–47. Therefore, ALJ Kilbane determined that Terrence K. was not disabled after January 30, 2014. R. 47. The Appeals Council denied his request for review, R. 7–11, and this appeal followed.

### III. Discussion

On appeal, Terrence K. challenges ALJ Kilbane's disability determination at two different stages of the five-step process. First, he argues that the ALJ erred at step three by failing to adequately explain why his ischemic heart disease did not meet or equal Listing 4.04.. Pl.'s Br. 7, ECF No. 14. Second, he argues that ALJ Kilbane erred in his subsequent RFC analysis by (i) failing to conduct a proper credibility determination, (ii) relying improperly on the

---

[1] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 416.967(b). A person who can meet these modest lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990).

DDS reconsideration determination and the treatment notes of one of Terrence K.'s providers, and (iii) failing to provide an adequate basis in the record for his RFC finding. *Id.* at 10–14.

A.    *Summary of the Relevant Evidence*

Terrence K. claims that he was disabled during the relevant period primarily because of his ischemic heart disease.

1.    *Treatment Notes & Diagnostic Tests*

On October 22, 2013, Terrence K. appeared in the Halifax Regional Hospital emergency room with complaints of abdominal pain, chest pain, and shortness of breath. R. 315. He had a history of hypertension, chest pain, and an unconfirmed myocardial infarction ("MI"), and he admitted that he was not taking medication for blood pressure and cholesterol that he had been instructed to use. *Id.* On exam, Terrence K. was noted to have normal breath sounds and a regular heart rate and rhythm. R. 316. A Troponin test came back positive, however, and he was admitted into the Intensive Care Unit ("ICU") for a cardiology evaluation and aggressive care management, including aspirin, oxygen, morphine, nitroglycerin drip, heparin drip, and lopressor protocol. R. 316–17.

On the following day, Terrence K. had a cardiology consultation. R. 318–19. Said B. Iskander, M.D., noted that Terrence K. had experienced an inferior wall MI in 2010 and was recommended to have a left heart catheterization, which he had refused. Terrence K. reported that he had been doing well since that event and had not experienced discomfort until recently. Based on current testing, Dr. Iskander assessed a non-ST elevation MI and recommended catheterization, *id.*, which showed 99% stenosis of the left anterior descending artery, total occlusion of the mid right coronary artery, and disease over portions of the distal left circumflex

artery, R. 337–38. Terrence K. thereafter underwent a successful percutaneous transluminal coronary angioplasty of his occluded left anterior descending artery. R. 339.

On November 8, 2013, Terrence K. visited Dr. Iskandar and complained of dyspnea on exertion. R. 375. He denied dyspnea at rest, chest pain, or impaired exercise tolerance. *See id*. Dr. Iskandar's exam findings, which included an examination of Terrence K.'s heart, vascular system, and respiratory system, were normal, R. 376, and Terrence K. was assessed as having controlled chronic coronary arteriosclerosis, controlled chronic dyslipidemia, controlled chronic hypertensive disorder, and uncontrolled tobacco dependence disorder, R. 377.[2]

In January 2014, Terrence K. returned to the emergency room at Halifax Regional with shortness of breath and chest pain radiating to his left arm, shoulder, and neck for the past two days. R. 285–86. Though he appeared to be in significant distress, his respiratory and heart exam were normal, R. 287, and a chest X-ray of his heart also returned normal findings, R. 308. He was discharged with a diagnosis of hetrosternal pain, systolic hypertension, left-sided chest pain, obesity, hypertensive disorder, and a history of MI. *See* R. 287. On February 7, Terrence K. followed up with Dr. Iskandar with complaints of chest pain and dyspnea on exertion, but with overall significant improvement in his symptoms. R. 371. He denied any shortness of breath or impaired exercise tolerance, and his respiratory, cardiac, and vascular exams were normal. R. 371–72. He was diagnosed with cardiomyopathy, coronary arteriosclerosis, hyperlipidemia, and hypertensive disorder, all of which were noted to be "chronic" and "controlled." R. 373. Dr. Iskandar recommended "diet and exercise" for weight loss and ordered an echocardiogram ("EKG"), R. 374, which Terrence K. underwent in March, R. 283–84. The EKG showed mild

---

[2] Dr. Iskandar's treatment note also references an echocardiogram from October 28, 2013, which showed Terrence K. had an ejection fraction ("EF") of 45–50%. R. 377. However, the actual results from that procedure are not part of the Administrative Record submitted to this Court.

concentric left ventricular hypertrophy; diastolic filling pattern indicating impaired relaxation, and mildly dilated left atrium. R. 284, 380–82. The study also showed that his "overall left ventricular systolic function [was] normal with an EF between 60–65%." R. 284. The treatment notes mention that the EKG "was a technically difficult study with suboptimal views." *Id.* Terrence K. made additional follow up visits to Dr. Iskandar in March and November 2014 complaining of continued dsypnea on exertion. *See* R. 367–74, 454–57. He complained of "knife like" chest pain during the March visit, but denied any chest pain during the November visit. R. 367, 454. His physical exam findings were normal on these visits, R. 368, 455, and Dr. Iskandar again recommended preventative care with medication management, diet, and exercise. R. 370, 457.

On August 24, 2015, Terrence K. visited the emergency room at Halifax Regional Hospital with complaints of intermittent chest discomfort that began after he lifted some heavy items a few days earlier. *See* R. 419–20. He was scheduled for a heart catheterization, but was apparently unhappy with his care and left on August 25 against medical advice to drive himself to Lynchburg General Hospital. *See id.* At that time he was found to be hypertensive with blood pressure of 168/116. He reported that he had not been taking his medications for some time because he could not afford them, and a chest X-ray showed cardiomegaly with pulmonary congestion and interstitial prominence, which could represent early pulmonary edema. R. 419–21. Evan Ownby, M.D., performed a heart catheterization, specifically a left ventriculography and coronary angiography, which revealed moderate-to-severe three vessel coronary artery disease; 100% occlusion of the distal left anterior descending artery; 100% occlusion of the mid to distal right coronary artery; 50% stenosis in the proximal left circumflex and proximal right coronary arteries; mild-to-moderate reduction in left ventricular systolic function with a left ventricular ejection fraction of 40%; and moderate-to-severe hypokinesis of the inferoapical wall of the left ventricle. R. 415–16. These findings indicated "unstable angina." R. 416. Terrence K.

was prescribed a medication regimen, including medication that he had ceased taking prior to his visit, R. 421, and he remained in the hospital until August 27 when he was deemed stable for discharge, R. 420.

On September 11, 2015, Terrence K. followed up with Dr. Ownby. The treatment note reports that he was back on his medications and "symptom-free." R. 469. Dr. Ownby did indicate, however, that his blood pressure was mildly elevated, and Dr. Ownby adjusted Terrence K.'s medication accordingly. *See id.* Terrence K. returned to Dr. Ownby in January 2016, and he complained of intermittent episodes of sharp chest pain despite compliance with his medication. R. 465. He also noted occasional pressure with exertion. *Id.* Dr. Ownby assessed deterioration in all problem areas: coronary artery disease, hypertension, history of tobacco abuse, obesity, and hyperlipidemia, R. 464, even though no corresponding abnormalities were noted on that date's physical examination , R. 467. Dr. Ownby noted persistent symptoms suggestive of angina, increased Terrence K.'s metoprolol, substituted simvastatin for atorvastatin, and recommended more aggressive risk factor modification. R. 464.

2.    *Terrence K.'s Subjective Statements*

In a pain questionnaire and function report completed in March 2014, Terrence K. indicated that he experienced burning and occasionally throbbing pain in his chest that "last[ed] about thirty minutes, sometimes longer." R. 226. He also claimed to experience aching pain in his head, arms, legs, back, and hands. *Id.* He lived in a single-wide mobile home with his girlfriend and described his daily activities as taking a bath, getting dressed, eating meals, watching television, going on short walks, taking a nap, using the restroom, and going to bed." R. 229. His girlfriend prepared most of the meals, but he prepared meals once or twice per week. R. 231. He could wash his own clothes, but he could not lift the laundry basket when filled with

clothes. *Id.* He shopped for groceries and clothes twice monthly and visited a friend's house once

a week to watch television and eat lunch. R. 232–33. Terrence K. also described some physical

limitations, indicating that he is able to lift only twenty pounds and that he has trouble with

things such as bending, reaching, walking, or climbing stairs. R. 234. He could walk for only

one-tenth of a mile before having to rest for thirty to forty-five minutes. *Id.*

During the administrative hearing in February 2016, Terrence K. testified that he

experienced daily chest pains, which prevented him from performing any heavy lifting and from

walking or standing for extended periods. *See* R. 56–58. He was unable to do basic work

activities around his house, such as cooking, cleaning, or landscaping. *See* R. 61. Although he

attempted to return to work at some point, he was unable to work for more than one week

because of his chest pain. R. 57.

### 3.   *Findings by DDS Physicians*

On May 6, 2014, Richard Surrusco, M.D., reviewed Terrence K.'s medical records

submitted to DDS through that date as part of an initial determination on his SSI claim. *See* R.

70–78. Based on his review, Dr. Surrusco opined that Terrence K. could occasionally lift and/or

carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for two hours in

an eight-hour workday, and sit for about six hours in an eight-hour workday. R. 75. Dr. Surrusco

attributed these limitations to Terrence K.'s October 2013 heart attack and the obstructions

shown from the heart catheterization. *Id.* In October 2014, Jack McWatters, M.D., reviewed

Terrence K.'s medical records at the reconsideration stage. *See* R. 80–90. Though he agreed with

Dr. Surrusco that Terrence K. could only occasionally lift and/or carry twenty pounds, frequently

lift and/or carry ten pounds, and sit for approximately six hours in an eight-hour workday, his

opinion differed from that of Dr. Surrusco in that he found Terrence K. could stand and/or walk

about six hours during an eight-hour workday. R. 85. As support for these limitations, Dr.

McWatters wrote, "MI treated with stent – no inducible ischemia, non exercise chest pain, severe

obesity, severe HTN with LVH and diastolic dysfunction, loose bone in knee joint." R. 86.

　　　　4.　　Findings by Dr. Richardson

　　　Around November 24, 2015, counsel for Terrence K. retained David Richardson, M.D.,

to review Terrence K.'s medical records to determine whether he met a listing. See R. 488–90.

Dr. Richardson concluded that Terrence K.'s "disorder fits the listing A.1.b.(ii) in the SSClist"

describing discomfort or pain because of myocardial ischemia, "with or without necrosis (death)

of heart muscles." R. 488. The ALJ noted in his decision that the language Dr. Richardson

referenced was from a prefatory section of the cardiovascular listing generally rather than a

section setting out the criteria for any particular impairment. R. 21; see 20 C.F.R. pt. 404, subpt.

P, app. 1 § 4.00(A)(1)(b)(ii)).

　　　Dr. Richardson's opinion also included "some suggestions" to Terrence K. if he wanted

to "reappl[y]" for disability. R. 488–89. These included a recommendation that Terrence K.'s

doctor be asked to perform a "radionucleid treadmill test," on which a positive result would show

that Terrence K. does have myocardial ischemia. R. 488.

B.　　Analysis

　　　　1.　　Listings

　　　Terrence K. first argues that the ALJ erred in finding that his heart condition did not

meeting Listing 4.04. The Listings are examples of medical conditions that "ordinarily prevent a

person from working" in any capacity, Sullivan v. Zebley, 493 U.S. 521, 533 (1990) (quotation

marks omitted), and a claimant whose medical condition meets or equals the severity of a listed

impairment is "entitled to a conclusive presumption" of disability within the meaning of the Act,

*Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (citing *Bowen v. City of New York*, 476

U.S. 467, 471 (1986)). A severe medical impairment(s) "meets" a Listing when it "satisfies all of

the criteria of that listing, including any relevant criteria in the introduction, and meets the [Act's

one-year] duration requirement." 20 C.F.R. § 416.925(c)(3); *see also Lusk v. Comm'r of Soc.*

*Sec.*, 106 F.. App'x 405, 411 (6th Cir. 2004) (explaining that the claimant "must present specific

medical findings that his impairment meets the applicable impairment or present medical

evidence that describes how his impairment is equivalent to a listed impairment"). To make this

determination, the ALJ generally must identify the relevant listed impairment(s) and "compare[]

each of the listed criteria" to the relevant evidence in the claimant's record. *Cook v. Heckler*, 783

F.2d 1168, 1173 (4th Cir. 1986).

At step three, ALJ Kilbane assessed whether Terrence K.'s heart condition satisfied the

criteria under Listing 4.04 regarding ischemic heart disease. R. 39.[3] In his appeal, Terrence K.

argues that he satisfied subpart C of that Listing, and that ALJ Kilbane did not adequately

explain his contrary conclusion. To meet Listing 4.04(C), a claimant must show (1) ischemic

heart disease "with symptoms due to myocardial ischemia, as described in [4.00(E)(3)–(7)],

while on a regimen of prescribed treatment"; (2) coronary artery disease demonstrated by

appropriate medically acceptable angiographic evidence showing a certain percentage of

coronary arterial or bypass vessel narrowing; (3) a finding by a medical consultant "that

performance of exercise tolerance testing would present a significant risk to the [claimant]"; and

(4) the coronary artery disease causes "very serious limitations in the ability to independently

initiate, sustain, or complete activities of daily living." 20 C.F.R. pt. 404, subpt. P, app.1 §

---

[3] ALJ Kilbane's decision also assessed whether Terrence K.'s heart condition might satisfy Listing 4.02
or whether Terrence K.'s obesity might exacerbate his heart impairment to the extent that it could meet or
equal a listing. R. 39. Terrence K.'s appeal, however, pertains only to ALJ Kilbane's analysis of Listing
4.04. Accordingly, the Court only assesses that listing section.

4.04(C)(1)–(2); *see Parrish v. Astrue*, Civ. No. 2:10-91, 2011 WL 3799843, at *13 (M.D. Tenn.

Aug. 29, 2011) (identifying the elements of Listing 4.04(C)), *adopted by* 2012 WL 1078881, at

*5–6 (M.D. Tenn. Mar. 30, 2012).

ALJ Kilbane found that Terrence K.'s severe ischemic heart disease did not satisfy

Listing 4.04(C) because there was "no evidence of . . . very serious limitations in [Terrence K.'s]

ability to independently initiate, sustain, or complete activities of daily living." *See* R. 39.

Terrence K. argues that this finding was cannot stand because the ALJ failed to address evidence

in the record detailing certain activities that Terrence K. could not perform because of his

impairment. Pl.'s Br. 8.

The ALJ did not adequately address the first two criteria of the listing—ischemic heart

disease with myocardial ischemia symptoms and angiographic evidence. *See* R. 39 (noting only

that Terrence K. has "discomfort or pain due to myocardial ischemia"). Considering Terrence

K.'s complaints of pain, the corroborating imaging, and the near total obstructions of the left

anterior descending artery shown in his heart catheterizations, the record certainly contains

evidence that warrants meaningful analysis in evaluating the first two criteria of Listing 4.04(C).

*See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 4.04(C)(1)(a)–(e)).This analysis is entirely absent from

the ALJ's decision. The ALJ's discussion of the final criterion is also deficient. The ALJ simply

concluded, "[t]here is no evidence of . . . very serious limitations in the ability to independently

initiate, sustain, or complete activities of daily living." R. 39; *see* 20 C.F.R. pt. 404, subpt. P,

app. 1 § 4.04(C)(2)). He provided no examples or analysis to explain this conclusion.

Later in his decision, the ALJ summarized Terrence K.'s statements about his significant

functional restrictions and limited daily activities, and he concluded that those statements were

"not entirely credible in light of the longitudinal medical record as a whole." R. 40–41. His entire

discussion of *why* Terrence K.'s statements could not be considered "fully credible," however, is that those statements were not supported by the "longitudinal medical record, including the recent observations and recommendations of Dr. Ownby." R. 45. Dr. Ownby did note symptom improvement after Terrence K. restarted his medications in September 2015, and he encouraged Terrence K. to lose weight and exercise. *See* R. 469. On the other hand, in January 2016, Dr. Ownby noted deterioration in Terrence K.'s heart condition and persistent symptoms suggestive of angina, and he increased Terrence K.'s medication. R. 464–67. Earlier treatment notes from the relevant period showed one MI and two heart catheterizations indicating near complete obstruction of the left descending coronary artery. This evidence is not so one-sided that the ALJ can simply point to the "longitudinal medical record as a whole," R. 41, or Dr. Ownby's "recent observations and recommendations," R. 45, and proclaim that they undermined Terrence K.'s report of symptoms and limitations. *Cf. Brown v. Colvin*, 639 F. App'x 921, 923 (4th Cir. 2016) (per curiam) (declining the parties' "invitations to review the medical record de novo to discover facts to support or refute" the ALJ's step-three conclusion where the ALJ's explanation was "devoid of reasoning" and the claimant's "medical record [was] not so one-sided that one could clearly decide, without analysis, that Listing 4.04C [was] not implicated"). Moreover, the ALJ's scant analysis says little about Terrence K.'s "ability to independently initiate, sustain, or complete activities of daily living." 20 C.F.R. pt. 404, subpt. P, app. 1 § 4.04(C)(2).

The ALJ also did not address the third criterion under Listing 4.04(C), regarding whether Terrence K. can safely complete an exercise tolerance test ("ETT"). An ETT is defined as "a sign-or symptom-limited test in which [the claimant] exercise[s] while connected to an ECG until [he] develop[s] a sign or symptom that indicates that [he has] exercised as much as is considered safe for [the claimant]." 20 C.F.R. pt. 404, subpt. P, app. 1 § 4.00(C)(3)(b). The

regulations state Listing 4.04(C) will be used to evaluate ischemic heart disease "only when" the claimant has "symptoms due to myocardial ischemia . . . while on a regimen of prescribed treatment," but the claimant's medical record "do[es] not [contain] a timely ETT or a timely normal drug-induced stress test. . . ." *Id.* § 4.00(E)(9)(g); *accord id.* § 4.04(C) (requiring additional medical-opinion evidence "in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test"). In lieu of an ETT under § 4.00(C)(3), the regulations provide that the claimant must produce evidence that a medical consultant "has concluded that performance of exercise tolerance testing would present a significant risk" to the claimant, *id.* § 4.04(C). *See Jackson v. Colvin*, No. 1:15cv598, 2016 WL 7378996, at *5 (M.D. Ala. Dec. 20, 2016) (concluding that Listing 4.04 requires either an ETT or a medical consultant's opinion regarding the risk of an ETT to explain why that objective diagnostic evidence is missing). The record says little about whether Terrence K. received an ETT and, if not, whether he was safely able to do so. For example, Terrence K.'s record from his January 2016 visit to Dr. Ownby states that Terrence K. had "requested [a] nuclear stress test . . . and was scheduled to be seen to assess medical indication and persistent symptoms." R. 464–65. The administrative record, however, does not indicate whether Terrence K. was actually seen regarding such testing.

It is the Plaintiff's burden to produce evidence establishing that he satisfied the criteria under a listing. *See Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The absence of an ETT or medical opinion excusing one would be sufficient for the ALJ to reasonably conclude on the record before him that Terrence K. does not meet Listing 4.04(C). Nevertheless, ALJ Kilbane did not address that criteria, and his entire analysis of Listing 4.04(C) is similarly deficient. Under these facts, the Court will "avoid engaging in fact-finding 'in the first instance' and []allow the ALJ to further develop the record" on remand. *Brown*, 639 F. App'x at 923 (quoting *Radford*,

734 F.3d at 296). On remand, the ALJ should consider any evidence pertaining to ETTs, and, if no such evidence is available, should evaluate whether to order an ETT or request findings from a medical provider regarding the risks of such a test. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 4.00(C)(6)(a)(i) (stating that the agency will consider whether to purchase an ETT when "[t]here is a question whether [the claimant's] cardiovascular impairment meets or medically equals the severity of one of the listings, or there is no timely test in the evidence," and the claimant cannot be found to be disabled on some other basis); *see also id.* § 4.00(C)(7)(b) (stating that if the claimant is "under the care of a treating source for a cardiovascular impairment, this source has not performed an exercise test, and there are no reported significant risks to testing," the agency "will request a statement from that source explaining why it was not done or should not be done before [the agency] decide[s] whether [it] will purchase the test" (internal citation omitted)).

2.    *RFC*

Terrence K.'s other objections generally challenge the ALJ's RFC determination. *See* Pl.'s Br. 10–14. A claimant's RFC represents his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite his medical impairments, including "those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *2, *5 (July 2, 1996) (emphasis omitted); *see* 20 C.F.R. § 416.945. It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined functionally limiting effects of impairments that are supported by the medical evidence or the claimant's credible reports of pain or other symptoms, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015).

The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 416.929. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *id.*, to work on a regular and continuing basis, *see Mascio*, 780 F.3d at 639. "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, and articulate specific reasons for the weight assigned to those statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013). When conducting this evaluation, the ALJ must consider all the evidence in the record bearing on the claimant's allegations that he is disabled by pain or other symptoms caused by a medical impairment; he cannot reject the claimant's description of his symptoms "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 416.929(c); *see Hines*, 453 F.3d at 565. The ALJ's reasons for discounting a claimant's complaints need only be legally adequate and supported by substantial evidence in the record. *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

More generally, the ALJ's RFC assessment must "include a narrative discussion describing" how medical facts and nonmedical evidence "support[] each conclusion," *Mascio*, 780 F.3d at 636, and explaining why she discounted any "obviously probative" evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977), that supports the individual's claim for disability benefits, *Ezzell v. Berryhill*, 688 F. App'x 199, 200 (4th Cir.

16

2017). This discussion should "build an accurate and logical bridge from the evidence to [the ALJ's] conclusion," *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), that the claimant retains a certain ability to sustain work-related activities, *Mascio*, 780 F.3d at 636–37.

In his RFC analysis, ALJ Kilbane first summarized much of the evidence related to Terrence K.'s pain and other symptoms, including physical examination findings, diagnostic tests and images, medical opinions, treatment recommendations, and Terrence K.'s statements to his healthcare providers, the state agency, and at the February 2016 administrative hearing. R. 39–45. Upon considering this evidence, ALJ Kilbane found that Terrence K. could perform light work as defined in 20 C.F.R. § 416.967(b) "except that he can never climb ladders, ropes, or scaffolds or crawl, he can only occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, and he must avoid concentrated exposure to extreme cold and extreme heat." R. 39.

ALJ Kilbane relied on certain treatment records from Dr. Ownby in finding that Terrence K.'s testimony describing significant pain and functional limitations was "not entirely credible in light of the longitudinal medical record as whole." R. 41; *see* R. 45. In particular, the ALJ relied on the September 11, 2015 treatment note in which Dr. Ownby recorded Terrence K.'s report that he "had been symptom-free now that he was back on medications," and that "[h]e remained free of chest pain with exertion and denied dyspnea on exertion." R. 45 (citing R. 468–71). He also noted that during Terrence K.'s January 4, 2016 visit, "Dr. Ownby again stressed the importance of weight loss, regular walking exercise, and calorie reduction." *Id.* (citing R. 464–67). ALJ Kilbane then concluded that Terrence K.'s "testimony about his symptoms and limitations cannot be assessed to be fully credible in light of the longitudinal medical record, including the recent observations and recommendations of Dr. Ownby." *Id.*

The Court finds that ALJ Kilbane's credibility assessment is insufficient. "A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford*, 734 F.3d at 295 (internal citation omitted). The ALJ does not need to discuss every piece of relevant evidence, but he "must evaluate the record fairly," *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (per curiam), and provide enough "analysis of the evidence to allow the [reviewing] court to trace the path of his reasoning," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). *See Lewis*, 858 F.3d at 869; *Mascio*, 780 F.3d at 636–38; *Hines*, 453 F.3d at 566 (citing *Diaz*, 55 F.3d at 307). Similarly, it is not enough for the ALJ to summarize the relevant evidence if he then fails to adequately explain how he resolved material ambiguities or conflicts in the record and why the credited evidence supports his findings and conclusions. *See Woods v. Berryhill*, 888 F.3d 868, 695 (4th Cir. 2018); *Monore*, 826 F.3d at 191. ALJ Kilbane's decision does not meet these minimum standards.

As noted, ALJ Kilbane relied heavily on Dr. Ownby's September 11, 2015 treatment record, which documented Terrence K.'s report that he was "symptom-free" after restarting his medications. R. 45. The ALJ apparently chose, however, not to credit Terrence K.'s subsequent report during his January 2016 visit to Dr. Ownby that he was experiencing "intermittent sharp episodes of chest pain" and "pressure on occasion with exertion." R. 465. Dr. Ownby characterized his impression as a "deterioration" in Terrence K.'s conditions, and he increased his medications and recommended weight loss, exercise, and calorie reduction. *Id.* In his analysis, the ALJ mentioned only the later recommendations, and, contrary to Dr. Ownby's impression of deterioration, the ALJ apparently interpreted this treatment note as showing an

inconsistency with Terrence K.'s report of deteriorating symptoms. Thus, the ALJ seemingly

relied only on those records or portions of records which were consistent with his ultimate RFC

finding, but did not explain why other evidence—from the same source no less—that

contradicted his findings was not reliable. *See Lewis*, 858 F.3d at 869 (faulting the ALJ for

cherrypicking normal findings from certain treatment notes where "the same medical records"

also contained relevant abnormal findings that the ALJ apparently did not consider). In doing so,

the ALJ committed error.

Additionally, the ALJ's assessment of the medical opinions is deficient. He cited the

limitations from the initial and reconsideration DDS opinions. Those opinions differed primarily

regarding the experts' assessment of the total amount of time Terrence K. could stand and/or

walk during a normal workday, either two or six hours. ALJ Kilbane assigned "great weight" to

the assessment of Dr. McWatters, who found at the reconsideration stage that Terrence K. could

perform work at a light capacity because he could lift twenty pounds occasionally, ten pounds

frequently, and sit and stand/walk for about six hours each in an eight-hour workday. *See* R. 45,

85–88.[4] The ALJ did not explain, however, why he apparently rejected Dr. Surrusco's opinion

that Terrence K. was only capable of standing/walking for at most two hours in a workday. *See*

R. 45, 74–78.

---

[4] Terrence K. also objects to ALJ Kilbane's reliance on Dr. McWatters's October 2014 opinion because
he did not have the opportunity to review subsequent findings of artery blockage made in November 2014
and August 2015. *See* Pl.'s Br. 12. This is not a reason for the Court to question ALJ Kilbane's reliance
on Dr. McWatter's opinion, however. Indeed, "an ALJ may rely on a medical source opinion that did not
have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and
substantial evidence supports the ALJ's decision." *Martin v. Colvin*, Civ. Action No. 6:15-4886, 2017
WL 9289385, at *12 (D.S.C. Jan 4, 2017) (citing *Thacker v. Astrue*, No. 3:11cv246, 2011 WL 7154218,
at *6 (W.D.N.C. Nov. 28, 2011)), *adopted by* 2017 WL 694646 (D.S.C. Feb. 22, 2017). Here, it is clear
that ALJ Kilbane at least considered the November 2014 and August 2015 records because he cited
findings from those records in his RFC assessment. R. 43–44. Though the Court does not ultimately find
that substantial evidence supports his RFC assessment, the ALJ did not err merely by relying, in part, on
the reconsideration determination.

In adopting the less-restrictive opinion, the ALJ provided an entirely boilerplate reason that offered no explanation of why he found one opinion more persuasive than the other. *See* R. 45 (according Dr. McWatters's opinion "great weight" because it "appear[ed] fair, balanced, and supported by the longitudinal medical record as a whole," without indicating what weight, if any, was accorded Dr. Surrusco's more restrictive opinion). The ALJ may rely on a non-examining source's medical opinion

> where that opinion has sufficient indicia of "supportability in the form of a high-quality explanation for the opinion and a significant amount of substantiating evidence, particularly medical signs and laboratory findings; consistency between the opinion and the record as a whole; and specialization in the subject matter of the opinion."

*See Woods*, 888 F.3d at 695 (quoting *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 268 (4th Cir. 2017)); *see* 20 C.F.R. § 416.927(c)(3). It may be that Dr. McWatters's opinion is better supported than Dr. Surrusco's. In weighing their competing medical opinions, the ALJ should provide reasons specific to the record in this case for why one opinion deserves more weight than the other. He will have an opportunity to do so on remand.

## IV. Conclusion

For the foregoing reasons, I cannot find that substantial evidence supports the Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District Judge **GRANT** Terrence K.'s Motion for Summary Judgment, ECF No. 13, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 17, **REVERSE** the Commissioner's final decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

20

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: November 13, 2018

Joel C. Hoppe
United States Magistrate Judge

21